*Electronically Filed*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

| | |
|---|---|
| POLYONE CORPORATION,<br><br>                 Plaintiff,<br>v.<br><br>WESTLAKE VINYLS, INC.,<br>2801 Post Oak Blvd.<br>Houston, TX 77056<br>  Serve:  CT Corporation System<br>           306 W Main Street<br>           Suite 512<br>           Frankfort, KY 40601<br><br>                 Defendant. | Case No.  5:17-cv-157-TBR |

## COMPLAINT

Plaintiff PolyOne Corporation ("PolyOne") files this Complaint against Defendant Westlake Vinyls, Inc. ("Westlake"), alleging as follows:

### PRELIMINARY STATEMENT

Since 1990, Westlake has operated a 160-acre vinyl chloride monomer manufacturing facility in Calvert City, Marshall County, Kentucky and produced hundreds of millions of pounds of chemicals at the facility. Now, twenty-seven years later, Westlake has demanded that PolyOne, as the indemnitor of the former owner of the facility, pay the bill for Westlake's voluntary construction activities to modify and expand the facility. Westlake has presented invoices for disposal of construction debris and excavated dirt and demanded payment by PolyOne by describing these costs as environmental "remediation." These costs are construction costs, not environmental remediation costs.

The distinction between construction costs and environmental remediation costs is critical because remediation costs are subject to mutual indemnity provisions in the 1990 and 1997 agreements transferring the facility to Westlake and the 2007 Settlement Agreement resolving the parties' litigation in this Court, whereas construction costs are not. Nothing in any of those agreements allows Westlake to run up millions of dollars in construction costs, during projects undertaken solely for its own benefit, and then hand the bill to PolyOne. PolyOne files this action to obtain a declaration that it is not responsible for Westlake's construction-related excavation and disposal costs under the 1990 Master Conveyance Agreement or the 1997 Purchase and Sale Agreement, through which Westlake acquired the facility, or under the 2007 Settlement Agreement between the parties.

## PARTIES

1. Plaintiff PolyOne Corporation is an Ohio Corporation with its principal place of business in Avon Lake, Ohio. PolyOne was formed in August 2000, when Geon Corporation ("Geon") merged with M.A. Hanna Company. Geon was formed in 1993, when Goodrich Corporation ("Goodrich") divested itself of the assets of its vinyl division to create Geon.

2. Defendant Westlake Vinyls, Inc. is a Delaware Corporation with its principal place of business in Calvert City, Marshall County, Kentucky.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, and PolyOne and Westlake are citizens of different states.

4. The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201- 2202 because an actual controversy exists.

5. Venue lies in this Court pursuant to 28 U.S.C. § 1391(b) because the acts and omissions giving rise to PolyOne's claims occurred in this judicial district, and because Westlake resides in this judicial district.

6. Assignment to this jury division is proper pursuant to Civil L.R. 3-2 because Westlake resides in Marshall County, Kentucky.

## GENERAL ALLEGATIONS

**A.   Westlake's Acquisition of the Plant**

7. Westlake owns and operates a vinyl chloride monomer ("VCM") manufacturing facility in Calvert City, Marshall County, Kentucky ("Westlake Plant"). The Westlake Plant houses three chemical manufacturing facilities, all owned and operated by Westlake: (1) the Chlorine Plant, which manufactures chlorine gas; (2) the Ethylene Plant, which produces ethylene; and (3) the EDC/VCM Plant, which produces ethylene dichloride ("EDC") and VCM, the final output of the facility. The Westlake Plant has the capacity to manufacture 1.3 billion pounds per year of VCM.

8. Westlake purchased the Plant from Goodrich in two separate transactions.

9. On or about March 1, 1990, Goodrich sold the EDC/VCM Plant to Westlake pursuant to a Master Conveyance Agreement. Pursuant to that Agreement, Westlake assumed ownership of and responsibility for operating and maintaining the EDC/VCM Plant.

10. The 1990 Master Conveyance Agreement includes mutual indemnity provisions providing that (a) Goodrich shall hold Westlake harmless from against "any and all loss, cost, damage, claim, judgment, fine, penalty, debt, liability or expense . . . which results from or arises out of or occurs in connection with . . . any injury, sickness, disease or death of any person, damage to any property or <u>remediation</u> of any soil, surface water and/or groundwater resulting from or attributable to events occurring or any condition existing prior to the Closing Date and arising from or in any way incident to the ownership, use and/or operation of the VCM Plant prior to the Closing Date"; and (b) Westlake shall hold Goodrich harmless "from and against any Liability which results from, arises out of or occurred in connection with . . . any injury, sickness, disease or death of any person, damage to any property or <u>remediation</u> of any soil, surface water and/or groundwater resulting from or attributable to events occurring from and after the Closing Date and arising from or in any way incident to the ownership, use and/or

operation of the VCM Plant after the Closing Date." (1990 Master Conveyance Agreement §§ 8.2(c), 8.3(c) (emphasis added).)

11. On or about August 15, 1997, Goodrich sold the Ethylene and Chlorine Plants, also known as the CA&O Plant, to Westlake pursuant to a Purchase and Sale Agreement. Pursuant to that Agreement, Westlake assumed ownership of and responsibility for operating and maintaining the Ethylene and Chorine Plants.

12. Like the 1990 Master Conveyance Agreement, the 1997 Purchase and Sale Agreement contained mutual indemnity provisions. Those provisions provide that (a) Goodrich shall hold Westlake harmless "from and against any and all loss, cost, damage, claim, judgment, fine, penalty, debt, liability or expense . . . which results from or arises out of or occurs in connection with . . . any injury, sickness, disease or death of any person, damage to any property or the investigation or <u>remediation</u> of any soil, surface water and/or groundwater resulting from or attributable to events occurring or any condition existing prior to the Closing Date and arising from or in any way incident to the ownership, use and/or operation of the CA&O Plant by BFG prior to the Closing Date"; and (b) Westlake shall hold Goodrich harmless "from and against any Liability which results from, arises out of or occurs in connection with . . . any injury, sickness, disease or death of any person, damage to any property or the investigation or <u>remediation</u> of any soil, surface water and/or groundwater resulting from or attributable to events occurring from and after the Closing Date and arising from or in any way incident to the ownership, use and/or operation of the CA&O Plant by Westlake after the Closing Date." (1997 Purchase and Sale Agreement §§ 8.2(c), 8.3(c) (emphasis added).)

13. Pursuant to the 1990 Master Conveyance Agreement and the 1997 Purchase and Sale Agreement, Goodrich retained responsibility for compliance with the 1990 Resource Conservation and Recovery Act ("RCRA") permit applicable to the operation of the EDC/VCM, Ethylene, and Chlorine Plants, and for any remediation or investigation of the Westlake Facility required under the RCRA permit. (Master Conveyance Agreement § 12.4; Purchase and Sale Agreement § 12.4.) In turn, as set forth above, the 1990 and 1997 Agreements

4

obligate Westlake to indemnify Goodrich for certain costs resulting from or attributable to its operations of the Westlake Plant after 1990 and 1997, respectively.

### B. PolyOne's Assumption of Goodrich's Liabilities

14. PolyOne never owned or operated the Westlake Plant. However, as a result of the 1993 Separation Agreement between Goodrich and Geon and the related Amended and Restated Assumption of Liabilities and Indemnification Agreement ("1993 ALIA"), PolyOne assumed certain liabilities of the former Goodrich vinyls division, including Goodrich's environmental liabilities associated with the EDC/VCM Plant, the CA&O Plant, and the RCRA permit.

15. The 1993 ALIA further provides that "Goodrich shall make available to Geon to the extent it can . . . the benefit of any assumption of liability or indemnification provision in any agreement with third parties with respect to liabilities assumed by Geon hereby." Thus, the 1993 ALIA provides that PolyOne, as Geon's successor, has the right to prosecute in Goodrich's name any claims Goodrich may have against third parties for contractual indemnity under the 1990 Master Conveyance Agreement and the 1997 Purchase and Sale Agreement, as well as obligating PolyOne to pay Goodrich's liabilities for indemnification of Westlake under the 1990 and 1997 Agreements. (*See Westlake Vinyls, Inc. v. Goodrich Corp.*, W.D. Ky. Case No. 5:03-cv-00240-TBR (Dkt #660) at 5, 25.)

### C. Environmental Conditions at the Westlake Plant

16. Releases of EDC, mercury, and other chemicals have occurred at the Westlake Plant since Goodrich began operating the Plant in the 1950s, and have continued after Westlake purchased the EDC/VCM Plant in 1990 and the Ethylene and Chlorine Plants in 1997.

17. Investigation of releases at the Plant began in the late 1970s and early 1980s. In 1986, Goodrich began installation of a network of groundwater extraction wells at the Plant under the supervision of the Kentucky Department of Environmental Protection ("KDEP"). The extraction well network, known as the Plantwide Corrective Action Program, or PCAP, continues to operate at the Plant and currently has a total of 51 wells. Groundwater extracted

from the wells is pumped to a steam stripper to remove EDC and other chemicals of concern present in groundwater due both Goodrich's and Westlake's chemical releases at the Plant.

18. When Westlake purchased the EDC/VCM Plant in 1990, Westlake knew that an investigation of soil and groundwater contamination under KDEP oversight was ongoing. In 1997, when Westlake purchased the Ethylene and Chlorine Plants, it knew the PCAP system was partially in place. Westlake had the right to conduct environmental due diligence activities during both transactions, and Westlake exercised that right. Thus, Westlake had knowledge of the condition of the facilities transferred in the two transactions at the time of its acquisitions.

19. Since 1990, Westlake has operated the steam stripper, known as the C-Stripper, and charges Goodrich for the cost of the services provided pursuant to a 1990 Manufacturing Services and Support Agreement between Westlake and Goodrich and a 1997 Environmental Services Agreement between Westlake and Goodrich.

20. Since it purchased the EDC/VCM Plant, Westlake has had large releases of EDC and other chemicals that have contributed to soil and groundwater contamination at the Facility. The largest chemical release in the history of Plant operations occurred on October 30, 2002, when Westlake caused over 2 million pounds of EDC to spill from a storage tank in the EDC/VCM Plant. Despite this and other large releases, Westlake has never paid for the operation of the PCAP system, nor has it otherwise paid the cost of environmental investigation and remediation at the Facility.

**D.     Prior Federal Litigation and the 2007 Settlement Agreement**

21. Westlake's October 2002 release of over 2 million pounds of EDC, combined with other releases of chemicals caused by Westlake's operations since 1990, led Goodrich to conclude, following an investigation, that Westlake should pay a share of the costs of operating the PCAP system. Accordingly, Goodrich began refusing to pay the full cost of C-Stripper invoices submitted by Westlake, and deducted from the invoices a percentage of the cost attributable to Westlake's releases.

22. On October 16, 2003, Westlake filed an action in this Court against Goodrich alleging breaches of the 1990 Master Conveyance Agreement and 1997 Purchase and Sale Agreement based on Goodrich's partial withholding of payments for Westlake C-Stripper invoices. (*See Westlake Vinyls, Inc. v. Goodrich Corporation*, W.D. Ky. Case No. 5:03-cv-00240-TBR.) Goodrich filed a third-party complaint in the action against PolyOne for indemnity under the 1993 Separation Agreement and the 1993 ALIA.

23. After four years of litigation, Westlake, Goodrich, and PolyOne reached a settlement to resolve the litigation in 2007. Under the terms of a December 19, 2007 Settlement and Release Agreement, the parties agreed to resolve liability for environmental investigation and remediation costs arising on or before July 31, 2007. PolyOne and Westlake agreed to arbitrate the allocation of certain environmental costs arising after July 31, 2007. Goodrich is not a party to the arbitration provisions of the 2007 Settlement Agreement.

24. The 2007 Settlement Agreement requires PolyOne and Westlake to arbitrate the amount and allocation of <u>certain specifically defined environmental costs</u> related to the Westlake Facility. The 2007 Settlement Agreement defines these "Allocable Costs" as follows:

> (1) the actual out-of-pocket expenditures incurred and paid by PolyOne after July 31, 2007 for <u>RCRA Permit, PCAP, investigation and/or remediation</u> costs associated with the Calvert City Site, including, without limitation, payments to Westlake under Section 3.2, in each case reduced by any payments actually received or recovered by Goodrich or PolyOne from any source relating to such out-of-pocket expenditure, or offset or credited to the account of Goodrich or PolyOne from any source relating to such out-of-pocket expenditure, without regard to the form of such receipt, recovery, offset or credit, which include, but are not limited to, payments resulting from settlements of or judgments on any claims; and

7

>   (2) the actual out-of-pocket expenditures incurred and paid by Westlake after July 31, 2007 for <u>RCRA Permit, PCAP, and investigation and/or remediation</u> costs associated with the Calvert City Site that Westlake contends are PolyOne's responsibility under the 1993 separation agreements between Goodrich and PolyOne, including the 1993 Separation Agreement, the 1993 Amended and Restated Assumption of Liabilities and Indemnification Agreement, the 1993 Plant Services Agreement along with all of its attachments and exhibits incorporated therein, including, inter alia, the exhibit entitled the "1993 Environmental Services Agreement," in each case reduced by any payments actually received or recovered by Westlake from any source relating to such out-of-pocket expenditures, or offset or credited to the account of Westlake from any source relating to such out-of-pocket expenditures, without regard to the form of such receipt, recovery, offset or credit, which include, but are not limited to, payments resulting from settlements of or judgments on any claims.

(2007 Settlement Agreement § 3.3(a) (emphasis added).) The 2007 Settlement Agreement provides that the costs to be allocated in arbitration "shall be limited to" Allocable Costs. (*Id.*)

25. Under the 2007 Settlement Agreement, PolyOne agreed to assume "Initial Responsibility" for 100% of Allocable Costs until an allocation between the parties is determined in arbitration. PolyOne filed a Demand for Arbitration seeking an allocation of Allocable Costs on May 19, 2017. That arbitration is currently pending, but presently there has been no allocation of Allocable Costs between the parties.

### E. Westlake's Claims for Construction-Related Excavation and Disposal Costs

26. In or around April 2014, Westlake began a construction project in the South Cracking area of the EDC/VCM Plant as part of an expansion of that Plant. As part of the South Cracking construction project, Westlake excavated approximately 2,173,522 pounds of soil and debris, which it disposed of as hazardous waste.

27. On or around November 18, 2016, Westlake submitted a claim to PolyOne under the 2007 Settlement Agreement and demanded reimbursement for $4,903,123.15 in costs associated with the excavation and disposal of soil and debris from the South Cracking construction project. Westlake also submitted the claimed costs to Goodrich for reimbursement under the 1990 Master Conveyance Agreement and the 1997 Purchase and Sale Agreement.

28. In or around January 2015, Westlake began construction of a new "E&E Maintenance Shop" in the North Synthesis area of the EDC/VCM Plant. As part of the E&E Maintenance Shop construction project, Westlake excavated approximately 287,520 pounds of soil, which it disposed of as hazardous waste.

29. On or around November 21, 2016, Westlake submitted a claim to PolyOne under the 2007 Settlement Agreement and demanded reimbursement for $139,929.60 in costs associated with the excavation and disposal of soil from the E&E Maintenance Shop construction project. Westlake also submitted the claimed costs to Goodrich for reimbursement under the 1990 Master Conveyance Agreement and the 1997 Purchase and Sale Agreement.

30. In addition, Westlake conducted soil and/or debris characterization activities associated with the E&E Maintenance Shop construction project.

31. In or around May 2015, Westlake began voluntary demolition activities around the #3 Fuel Oil Tank in the Ethylene Plant and conducted soil and/or debris characterization activities associated with the demolition activities.

32. Between July 2015 and June 2016, Westlake submitted claims to PolyOne under the 2007 Settlement Agreement and demanded reimbursement for $27,178.64 in costs associated with soil and/or debris characterization activities at the #3 Fuel Oil Tank and the E&E Maintenance Shop. Westlake also submitted the claimed costs to Goodrich for reimbursement under the 1990 Master Conveyance Agreement and the 1997 Purchase and Sale Agreement.

33. In or around July 2015, Westlake began a construction project at the "Hypo Tower" in the Chorine Plant. As part of its construction project, Westlake excavated approximately 3,744,280 pounds of soil, which it disposed of as hazardous waste.

34. On or around November 22, 2016, Westlake submitted a claim to PolyOne under the 2007 Settlement Agreement and demanded reimbursement for $705,887.50 in costs associated with the excavation and disposal of soil from the Hypo Tower construction project. Westlake also submitted the claimed costs to Goodrich for reimbursement under the 1990 Master Conveyance Agreement and the 1997 Purchase and Sale Agreement.

35. Upon receipt of Westlake's claims, PolyOne reviewed invoices provided by Westlake to determine if the costs for which Westlake sought reimbursement were Allocable Costs under the 2007 Settlement Agreement or were within the indemnity provisions of the 1990 Master Conveyance Agreement or the 1997 Purchase and Sale Agreement. Based on PolyOne's review, the costs were related to the excavation and disposal of soil and debris during Westlake's construction projects, and not to environmental remediation. In addition, Westlake failed to provide work plans that adequately described Westlake's procedures for the characterization, management, and disposal of waste generated during the excavations; analytical results to support Westlake's determination that the soil and debris generated during the construction projects must be disposed of as hazardous waste; and other information that would allow PolyOne to evaluate Westlake's claims.

36. On or around April 11, 2017, PolyOne sent Westlake a letter requesting additional information about Westlake's indemnity claims for the South Cracking, E&E Maintenance Shop, and Hypo Tower excavation and disposal costs.

37. On or around September 13, 2017, Westlake responded to PolyOne's April 11 letter by providing additional documentation related to the characterization and disposal of waste from its construction projects. However, the documentation provided by Westlake was disorganized and incomplete. In addition, the laboratory analyses provided by Westlake revealed that more than 100 roll-off boxes of soil and/or debris from the excavations were not hazardous, but were improperly disposed of as hazardous waste, thereby greatly inflating disposal costs. And most significantly, the documents confirmed that there was no remedial standard or purpose associated with the excavations, and that soils were excavated only to the extent necessary to

install new equipment. This confirmed that the costs submitted by Westlake were construction costs, and not environmental remediation costs.

38. On or around September 19, 2017, Westlake sent another letter to PolyOne withdrawing $33,303.80 in costs submitted for the South Cracking project but demanding that PolyOne pay the remaining $5,715,636.45 of Westlake's claims for the South Cracking, E&E Maintenance Shop, and Hypo Tower excavation and disposal costs.

39. On or around October 5, 2017, Westlake filed a Cross Notice of Arbitration before the JAMS arbitration panel requesting an award requiring PolyOne to reimburse Westlake for 100% of the claimed $5,715,636.45 in South Cracking, E&E Maintenance Shop, and Hypo Tower excavation and disposal costs. In addition, Westlake's Cross-Notice requests that PolyOne reimburse Westlake for 100% of the waste characterization costs incurred at the #3 Fuel Oil Tank and the E&E Maintenance Shop.

40. Westlake contends that these excavation, disposal, and waste characterization costs are Allocable Costs for which PolyOne must assume Initial Responsibility under the 2007 Settlement Agreement. However, the definition of Allocable Costs in the 2007 Settlement Agreement does not include construction-related soil and debris disposal costs. The Settlement Agreement defines four categories of Allocable Costs, which are costs arising out of (1) RCRA permit compliance; (2) the PCAP system; (3) environmental investigation; and (4) environmental remediation. Although Westlake contends that the excavation costs are "remediation" costs, all three of the Westlake excavations at issue were required for construction projects, and had no remedial purpose. No regulatory agency required or supervised Westlake's excavation activities. Further, Westlake did not make any effort to delineate contamination or identify remediation standards for leaving soil and/or debris in place. Westlake excavated soil and/or debris to the extent necessary <u>for its construction projects</u>, and left the remaining soil in place regardless of the level of contamination present. PolyOne contends that these costs are not remediation costs, nor are they in any other category of costs within the scope of Allocable Costs under the 2007 Settlement Agreement.

41. Westlake also contends that it is entitled to indemnification for the South Cracking, E&E Maintenance Shop, and Hypo Tower excavation, disposal, and waste characterization costs under the 1990 Master Conveyance Agreement and/or the 1997 Purchase and Sale Agreement. However, the excavation and disposal of soil generated during a construction project is not "the remediation of any soil, surface water and/or groundwater" covered by the indemnity provisions of the 1990 Agreement or "the investigation or remediation of any soil, surface water and/or groundwater" covered by the indemnity provisions of the 1997 Agreement, nor are such costs otherwise indemnifiable under the 1990 Master Conveyance Agreement or the 1997 Purchase and Sale Agreement. PolyOne contends that neither PolyOne nor Goodrich is contractually obligated to pay for the disposal of soil and debris generated by Westlake's construction activities, and that the South Cracking, E&E Maintenance Shop, and Hypo Tower excavation, disposal, and waste characterization costs are not indemnifiable under the 1990 Master Conveyance Agreement or the 1997 Purchase and Sale Agreement.

42. In summary, PolyOne contends that the South Cracking, E&E Maintenance Shop, and Hypo Tower excavation, disposal, and waste characterization costs claimed by Westlake are not Allocable Costs under the 2007 Settlement Agreement. In addition, PolyOne has no obligation to indemnify Westlake for the claimed costs under the 1990 Master Conveyance Agreement or the 1997 Purchase and Sale Agreement because the construction costs are not covered under the indemnity provisions contained in those agreements. Further, the claimed costs are different in nature than those addressed in the prior federal litigation between Westlake, Goodrich, and PolyOne, and were therefore not addressed in any prior order issued by this Court. Accordingly, PolyOne requests a judicial determination of the parties' rights and obligations under the 1990, 1997, and 2007 Agreements with respect to the claimed costs.

## COUNT I

### Declaratory Judgment Under 28 U.S.C. §§ 2201 & 2202

43. PolyOne incorporates by reference the allegations contained in Paragraphs 1-42 as if fully restated herein.

44. An actual controversy has arisen and now exists between PolyOne and Westlake with respect to the interpretation of the 2007 Settlement Agreement. PolyOne disputes Westlake's characterization of excavation, disposal, and waste characterization costs incurred by Westlake at the South Cracking, E&E Maintenance Shop, and Hypo Tower areas of the Westlake Plant as environmental remediation costs, and contends that such costs are not Allocable Costs under the 2007 Settlement Agreement.

45. Pursuant to 28 U.S.C. §§ 2201 and 2202, a judicial determination of the respective rights of the parties is necessary and appropriate under the circumstances, in addition to such further necessary or proper relief the Court deems appropriate.

## COUNT II

### Declaratory Judgment Under 28 U.S.C. §§ 2201 & 2202

46. PolyOne incorporates by reference the allegations contained in Paragraphs 1-45 as if fully restated herein.

47. An actual controversy has arisen and now exists between PolyOne and Westlake with respect to the interpretation of the 1990 Master Conveyance Agreement. Westlake has submitted excavation, disposal costs, and waste characterization costs incurred by Westlake at the South Cracking, E&E Maintenance Shop, and Hypo Tower for indemnification under the Master Conveyance Agreement. PolyOne disputes Westlake's characterization of these costs as within the scope of the indemnity provisions of the 1990 Master Conveyance Agreement, and contends that neither PolyOne nor Goodrich has an obligation to indemnify Westlake for the cost of excavating and disposing of soil and debris for purposes of Westlake's construction projects.

48. Pursuant to 28 U.S.C. §§ 2201 and 2202, a judicial determination of the respective rights of the parties is necessary and appropriate under the circumstances, in addition to such further necessary or proper relief the Court deems appropriate.

## COUNT III

### Declaratory Judgment Under 28 U.S.C. §§ 2201 & 2202

49. PolyOne incorporates by reference the allegations contained in Paragraphs 1-48 as if fully restated herein.

50. An actual controversy has arisen and now exists between PolyOne and Westlake with respect to the interpretation of the 1997 Purchase and Sale Agreement. Westlake has submitted excavation, disposal costs, and waste characterization costs incurred by Westlake at the South Cracking, E&E Maintenance Shop, and Hypo Tower for indemnification under the Purchase and Sale Agreement. PolyOne disputes Westlake's characterization of these costs as within the scope of the indemnity provisions of the 1997 Purchase and Sale Agreement, and contends that neither PolyOne nor Goodrich has an obligation to indemnify Westlake for the cost of excavating and disposing of soil and debris for purposes of Westlake's construction projects.

51. Pursuant to 28 U.S.C. §§ 2201 and 2202, a judicial determination of the respective rights of the parties is necessary and appropriate under the circumstances, in addition to such further necessary or proper relief the Court deems appropriate.

### PRAYER FOR RELIEF

With respect to its Complaint, and based on the foregoing, PolyOne prays for the following relief:

1. A declaration that excavation, disposal, and waste characterization costs incurred by Westlake at the South Cracking, E&E Maintenance Shop, and Hypo Tower areas of the Westlake Plant are not Allocable Costs under the 2007 Settlement Agreement.

2. A declaration that neither Goodrich nor PolyOne has any obligation under the 1990 Master Conveyance Agreement to indemnify Westlake for excavation, disposal, and waste characterization costs incurred due to Westlake's construction activities at the South Cracking, E&E Maintenance Shop, and Hypo Tower areas of the Westlake Plant.

3. A declaration that neither Goodrich nor PolyOne has any obligation under the 1997 Purchase and Sale Agreement to indemnify Westlake for excavation, disposal, and waste

characterization costs incurred due to Westlake's construction activities at the South Cracking, E&E Maintenance Shop, and Hypo Tower areas of the Westlake Plant.

    4.  An award of attorneys' fees and costs of this action to the fullest extent permitted by law.

    5.  Any and all additional relief as the Court deems just and proper.

This 6th day of October, 2017.

            BINGHAM GREENEBAUM DOLL LLP

            By: /s/ Mark S. Riddle
              Mark S. Riddle
              Lauren R. Nichols
              BINGHAM GREENEBAUM DOLL LLP
              3500 PNC Tower
              101 South Fifth Street
              Louisville, KY 40202
              Telephone: (502) 587-3623
              Facimile: (502) 540-2194

            HANSON BRIDGETT LLP

            By: /s/Davina Pujari
              Davina Pujari*
              Lawrence M. Cirelli*
              Christopher D. Jensen
              Samir J. Abdelnour*
              HANSON BRIDGETT LLP
              425 Market Street, 26th Floor
              San Francisco, California 94105
              Telephone: (415) 777-3200
              Facsimile: (415) 541-9366

            Attorneys for PLAINTIFF POLYONE CORPORATION

            * *Pro Hac Vice* application to be filed