UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:17-CV-157-TBR

POLYONE CORPORATION,                                               PLAINTIFF

v.

WESTLAKE VINYLS, INC.,                                             DEFENDANT

## MEMORANDUM OPINION

This matter is before the Court on Defendant Westlake Vinyls, Inc.'s ("Westlake")

Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), [R. 25], and Plaintiff

PolyOne Corporation's ("PolyOne") Objection to Submission of Evidence in Support of

Westlake's Motion to Dismiss, [R. 35]. PolyOne responded to Westlake's Motion to Dismiss, [R.

27], and Westlake replied, [R. 36]. Westlake responded to PolyOne's Objection. [R. 38.] This

matter is now ripe for adjudication. For the reasons stated herein, Westlake's Motion to Dismiss,

[R. 25], is **GRANTED**. Westlake's previous Motion to Dismiss, [R. 10], is **DENIED AS**

**MOOT**. PolyOne's Objection, [R. 35], is **DENIED AS MOOT**. PolyOne's Motion to Strike

Westlake's Motion to Dismiss and Request to Remove Incorrectly Filed Documents, [R. 20], is

**DENIED AS MOOT**.

## BACKGROUND

The factual allegations as set out in the Amended Complaint, [R. 23], and taken as true

are as follows.[1] At the center of this case is a vinyl chloride monomer (VCM) manufacturing

facility in Calvert City, Marshall County, Kentucky ("the Facility"). [R. 23 at 2-3 (Amended

Complaint).] The VCM facility contains three different chemical manufacturing areas: (1) the

_____

[1] *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008)
("All factual allegations in the complaint must be presumed to be true, and reasonable inferences must be made in
favor of the non-moving party.").

Chlorine Plant, which produces chlorine gas; (2) the Ethylene Plant, which manufactures ethylene; and (3) the EDC/VCM Plant, which manufactures ethylene dichloride (EDC) and VCM, the final product of the facility. [*Id*. at 3.]

## A.  Westlake Acquires the Facility

On or about March 1, 1990, Westlake Vinyls, Inc. purchased the EDC/VCM Plant from Goodrich Corporation pursuant to a Master Conveyance Agreement ("the 1990 Agreement"). [*Id.*] Under that agreement, Westlake assumed ownership of the EDC/VCM Plant and became responsible for operating and maintaining it. [*Id.*] The 1990 Master Conveyance Agreement includes mutual indemnity provisions in which Goodrich will indemnify Westlake

> from and against any and all loss, cost, damage, claim, judgment, fine, penalty, debt, liability or expense . . . which results from or arises out of or occurs in connection with . . . any injury, sickness, disease or death of any person, damage to any property or remediation of any soil, surface water and/or groundwater resulting from or attributable to events occurring prior to or any condition existing prior to the Closing Date and arising from or in any way incident to the ownership, use and/or operation of the VCM Plant prior to the Closing Date . . ..

[*Id*. (quoting 1990 Master Conveyance Agreement § 8.2(c))]. Also, it states that Goodrich shall hold Westlake harmless

> "from and against any and all loss, cost, damage, claim, judgment, fine, penalty, debt, liability or expense . . . which results from or arises out of or occurs in connection with . . . the Retained Liabilities," which are defined as "all liabilities and obligations . . . with respect to or arising out of the EDC or VCM business conducted by Goodrich at the Calvert City complex, or the ownership, possession or use of the Assets, or the employment or compensation of any of the employees, prior to the Closing" . . ..

[*Id*. at 4 (quoting 1990 Master Conveyance Agreement §§ 1.4(b), 8.2(a)).] The 1990 Master Conveyance Agreement also includes a provision that Westlake shall hold Goodrich harmless

> from and against any Liability which results from, arises out of or occurs in connection with . . . any injury, sickness, disease or death of any person, damage to any property or remediation of any soil, surface water and/or groundwater resulting from or attributable to events occurring from and after the Closing Date

and arising from or in any way incident to the ownership, use and/or operation of
the VCM Plant after the Closing Date

[*Id*. at 3 (quoting 1990 Master Conveyance Agreement § 8.3(c)).] Also, it states that Westlake

will indemnify Goodrich "against any Liability which results from, arises out of or occurs in

connection with . . . any assigned or assumed liability or obligation of Buyer contained herein."

[*Id*. at 4 (quoting 1990 Master Conveyance Agreement § 8.3(a)).]

On or about August 15, 1997, Westlake purchased the Ethylene and Chlorine Plants, also

known as the CA&O Plant, from Goodrich pursuant to a Purchase and Sale Agreement ("the

1997 Agreement"). [*Id*.] Under that agreement, Westlake assumed ownership of the CA&O Plant

and responsibility for operating and maintaining it. [*Id*.] The Purchase and Sale Agreement

contained mutual indemnity provisions similar to those of the 1990 Master Conveyance

Agreement. [*Id*.] Under the Purchase and Sale Agreement, Goodrich shall hold Westlake

harmless

from and against any and all loss, cost, damage, claim, judgment, fine, penalty,
debt, liability or expense . . . which results from or arises out of or occurs in
connection with . . . any injury, sickness, disease or death of any person, damage
to any property or the investigation or remediation of any soil, surface water
and/or groundwater resulting from or attributable to events occurring or any
condition existing prior to the Closing Date and arising from or in any way
incident to the ownership, use and/or operation of the CA&O Plant by BFG prior
to the Closing Date

[*Id*. at 4 (quoting 1997 Purchase and Sale Agreement § 8.2(c)).] Also, Goodrich will indemnify

Westlake

"from and against any and all loss, cost, damage, claim, judgment, fine, penalty,
debt, liability or expense . . . which results from or arises out of or occurs in
connection with . . . the Retained Liabilities," which are defined as "all liabilities
and obligations . . . with respect to or arising out of the use, operation or
ownership of the CA&O Plant, or the ownership, possession or use of the Assets,
or the employment or compensation of any of the employees, prior to the
Closing"

[*Id*. at 5 (quoting 1997 Purchase and Sale Agreement §§ 1.4(d), 8.2(a)).] Also, it states that

Westlake shall hold Goodrich harmless

> from and against any Liability which results from, arises out of or occurs in
> connection with . . . any injury, sickness, disease or death of any person, damage
> to any property or the investigation or remediation of any soil, surface water
> and/or groundwater resulting from or attributable to events occurring from and
> after the Closing Date and arising from or in any way incident to the ownership,
> use and/or operation of the CA&O Plant by Westlake after the Closing Date.

[*Id*. at 4 (quoting 1997 Purchase and Sale Agreement § 8.3(c)).] Furthermore, Westlake agreed to

indemnify Goodrich "from and against any Liability which results from, arises out of or occurs

in connection with . . . any assigned or assumed liability or obligation of Westlake contained

herein." [*Id*. at 5 (quoting 1997 Purchase and Sale Agreement § 8.3(a)).]

Under the 1990 Master Conveyance Agreement and the 1997 Purchase and Sale

Agreement, Goodrich remained responsible for compliance with the 1989 Resource

Conservation and Recovery Act (RCRA) permit applicable to environmental investigation and

remediation at the facility. [*Id*.] Thus, the 1990 and 1997 agreements require Westlake to also

indemnify Goodrich for certain costs resulting from or attributable to its operations of the facility

subsequent to those agreements. [*Id*.]

**B. PolyOne's Assumption of Goodrich's Liabilities**

In 1993, Goodrich divested itself of the assets of its vinyl division in order to create Geon

Corporation. [*Id*. at 2.] In August of 2000, Geon merged with M.A. Hanna Company—forming

PolyOne Corporation. [*Id*.] Although PolyOne never owned or operated the Facility, it inherited

certain liabilities of the former Goodrich vinyl division, such as Goodrich's environmental

liabilities associated with the EDC/VCM Plant, the CA&O Plant, and the RCRA permit under

the 1993 Separation Agreement between Goodrich and Geon and the related Amended and

Restated Assumption of Liabilities and Indemnification Agreement ("1993 ALIA"). [*Id*. at 5.]

The 1993 ALIA also provides that "Goodrich shall make available to Geon to the extent it can . . . the benefit of any assumption of liability or indemnification provision in any agreement with third parties with respect to liabilities assumed by Geon hereby." [*Id*. at 6 (quoting the 1993 ALIA).] In other words, PolyOne interprets this to mean that PolyOne may prosecute, on behalf of Goodrich, any claims Goodrich may have against third parties for contractual indemnity under the 1990 Agreement and the 1997 Agreement. [*Id*.] However, it also obligates PolyOne to pay Goodrich's liabilities for indemnification of Westlake under the 1990 Agreement and 1997 Agreement. [*Id*.]

### C.  Environmental Conditions at the Facility

PolyOne alleges that from the time of Goodrich's operations up until present day, releases of EDC, mercury, and other chemicals have occurred at the Facility. [*Id*.] Both the Kentucky Department of Environmental Protection (KDEP) and the U.S. Environmental Protection Agency (EPA) began investigating these releases of chemicals in the late 1970s and early 1980s. [*Id*.] In 1986, Goodrich began installation of a network of groundwater extraction wells at the Facility, known as the Plantwide Corrective Action Program, or PCAP, which still operates today. [*Id*.] The PCAP extracts groundwater which is then "pumped to a steam stripper to remove EDC and other chemicals of concern present in groundwater due to both Goodrich's and Westlake's chemical releases at the Plant." [*Id*.] PolyOne alleges that although Westlake has operated the steam stripper, or C-Stripper, since 1990, it charges Goodrich for the cost of that operation pursuant to a 1990 Manufacturing Services and Support Agreement between Westlake and Goodrich and a 1997 Environmental Services Agreement between Westlake and Goodrich. [*Id*. at 7.] Furthermore, PolyOne claims that, despite releasing large amounts of "EDC and other chemicals that have contributed to soil and groundwater contamination," Westlake has never

paid for the operation of the PCAP or environmental investigation and remediation at the Facility. [*Id.*]

### D. Prior Litigation Leading to the 2007 Settlement Agreement

In 2003, litigation ensued between Westlake, Goodrich, and PolyOne when Goodrich concluded that Westlake should have to pay a share of the costs of the release of chemicals allegedly caused by Westlake's operations. [*Id.* at 7.] The parties filed a flurry of actions based on the indemnity provisions in the 1990 Master Conveyance Agreement, 1997 Purchase and Sale Agreement, 1993 Separation Agreement, and 1993 ALIA. [*Id.* at 7-8.] Four years later, the parties reached a settlement pursuant to the 2007 Settlement and Release Agreement, ("2007 Agreement"), which resolved liability for environmental investigation and remediation costs arising on or before July 31, 2007. [*Id.* at 8.]

Significant to the matter at hand, PolyOne alleges that "[t]he 2007 Settlement Agreement requires PolyOne and Westlake to arbitrate the amount and allocation of <u>certain specifically defined environmental costs</u> related to the Westlake Plant." [*Id.*] These "Allocable Costs" are defined in the agreement as:

> (1) the actual out-of-pocket expenditures incurred and paid by PolyOne after July 31, 2007 for RCRA Permit, PCAP, investigation and/or remediation costs associated with the Calvert City Site, including, without limitation, payments to Westlake under Section 3.2, in each case reduced by any payments actually received or recovered by Goodrich or PolyOne from any source relating to such out-of-pocket expenditure, or offset or credited to the account of Goodrich or PolyOne from any source relating to such out-of-pocket expenditure, without regard to the form of such receipt, recovery, offset or credit, which include, but are not limited to, payments resulting from settlements of or judgments on any claims; and
>
> (2) the actual out-of-pocket expenditures incurred and paid by Westlake after July 31, 2007 for RCRA Permit, PCAP, and investigation and/or remediation costs associated with the Calvert City Site that Westlake contends are PolyOne's responsibility under the 1993 separation agreements between Goodrich and PolyOne, including the 1993 Separation Agreement, the 1993 Amended and

Restated Assumption of Liabilities and Indemnification Agreement, the 1993 Plant Services Agreement along with all of its attachments and exhibits incorporated therein, including, inter alia, the exhibit entitled the "1993 Environmental Services Agreement," in each case reduced by any payments actually received or recovered by Westlake from any source relating to such out-of-pocket expenditures, or offset or credited to the account of Westlake from any source relating to such out-of-pocket expenditures, without regard to the form of such receipt, recovery, offset or credit, which include, but are not limited to, payments resulting from settlements of or judgments on any claims.

[*Id*. at 8-9 (quoting 2007 Settlement Agreement §3.3(a)).] PolyOne alleges that the 2007 Agreement "provides that the costs to be allocated in arbitration 'shall be limited to' Allocable Costs," and, under that agreement, "PolyOne agreed to assume 'Initial Responsibility' for 100% of Allocable Costs until an allocation between the parties is determined in arbitration." [*Id*. at 9.] Furthermore, PolyOne states that it filed a Demand for Arbitration seeking an allocation of Allocable Costs on May 19, 2017, which is currently pending without an allocation of Allocable Costs between the parties. [*Id*.]

### E. Westlake's Disputed Costs

According to PolyOne, from 2010 to 2015, Westlake engaged in a series of six projects in different areas of the Facility. [*Id*. at 9-16.] Westlake submitted claims for reimbursement in regards to each project to both PolyOne and Goodrich. [*Id*.]

#### 1. Soda Ash Reactor

Around July 2010, Westlake began installation of a Soda Ash Reactor in the Chlorine Plant. [*Id*. at 14.] As part of the project, PolyOne alleges that Westlake excavated and disposed of 13,600 pounds of soil as hazardous waste. [*Id*.] PolyOne claims that "Westlake only excavated the amount of soil necessary to construct the Soda Ash Reactor foundation," and "Westlake did not conduct excavation for any remedial purpose." [*Id*.] Around that same time, Westlake submitted a claim to Goodrich under the 1997 Purchase and Sale Agreement and

PolyOne under the 1993 ALIA demanding reimbursement for the $37,975.20 in costs for the excavation and disposal of soil. [*Id*.] PolyOne alleges that it paid these costs on or around October 12, 2010. [*Id*. at 15.]

### 2. Mercury Cell Building

Around November 2011, Westlake began to demolish the Mercury Cell Building as part of the expansion of the Chlorine Plant. [*Id*.] In the process of demolition, PolyOne alleges that Westlake generated approximately 772,426 pounds of debris that was disposed of as hazardous waste. [*Id*.] PolyOne claims that this demolition was "not done for remedial purposes, but rather was part of the Chlorine Plant expansion project." [*Id*.] Approximately between November 2012 and April 2013, PolyOne states that Westlake submitted claims to Goodrich pursuant to the 1997 Purchase and Sale Agreement and PolyOne under the 1993 ALIA demanding reimbursement for $801,083.53 in costs related to excavation and disposal of soil and debris from the demolition. [*Id*.] Between January 2013 and July 2013, PolyOne states that it paid the $801,083.53 "subject to a reservation of its right to object to the designation of such costs as Allocable Costs under the 2007 Settlement Agreement." [*Id*.]

### 3. South Cracking Area

Around April 2014, Westlake began an expansion of the EDC/VCM Plant in the South Cracking area. [*Id*. at 9.] In the process, PolyOne alleges that Westlake excavated approximately 2,173,522 pounds of soil and debris that were disposed of as hazardous waste. [*Id*.] PolyOne states that on or around November 18, 2016, Westlake submitted a claim to PolyOne under the 2007 Settlement Agreement and to Goodrich under the 1990 Master Conveyance Agreement and the 1997 Purchase and Sale Agreement demanding reimbursement of $4,903,123.15 in costs associated with the excavation and disposal of soil and debris. [*Id*.] Also, Westlake allegedly

submitted a claim demanding reimbursement of $106.00 in well abandonment costs as a part of the same project. [*Id*. at 10.]

### 4. E&E Maintenance Shop

PolyOne alleges that, in or around July 2015, Westlake began construction of a new "E&E Maintenance Shop" in the North Synthesis area of the EDM/VCM Plant causing an excavation of approximately 287,520 pounds of soil that was disposed of as hazardous waste. [*Id*.] Furthermore, PolyOne states that "Westlake conducted soil and/or debris characterization activities" associated with this project. [*Id*.] On or around November 21, 2016, Westlake allegedly submitted a claim to PolyOne under the 2007 Settlement Agreement and Goodrich under the 1990 Master Conveyance Agreement and the 1997 Purchase and Sale Agreement demanding reimbursement for $139,929.60 in costs associated with the excavation and disposal of soil during the project. [*Id*.]

### 5. #3 Fuel Oil Tank

PolyOne alleges that around May 2015, Westlake "began voluntary demolition activities around the #3 Fuel Oil Tank in the Ethylene Plant and conducted soil and/or debris characterization activities associated with the demolition activities." [*Id*.] Between July 2015 and June 2016, Westlake allegedly submitted claims to PolyOne under the 2007 Settlement Agreement and to Goodrich pursuant to the 1990 Master Conveyance Agreement and the 1997 Purchase and Sale Agreement demanding reimbursement of $27,178.64 in costs for the soil and/or debris characterization activities.

### 6. "Hypo Tower"

PolyOne alleges that around July 2015, Westlake began a "construction project" at the "Hypo Tower" in the Chlorine Plant in which Westlake excavated approximately 3,744,280

pounds of soil that it disposed of as hazardous waste. [*Id*.] PolyOne states that on or around November 22, 2016, Westlake submitted a claim to PolyOne under the 2007 Settlement Agreement and to Goodrich pursuant to the 1990 Master Conveyance Agreement and the 1997 Purchase and Sale Agreement demanding reimbursement of $705, 887.50 in costs for the excavation and disposal of the soil. [*Id*. at 10-11.]

### F. Correspondence Concerning the Costs

On or around April 11, 2017, PolyOne sent a letter to Westlake "requesting additional information about Westlake's indemnity claims for the South Cracking, E&E Maintenance Shop, and Hypo Tower excavation and disposal costs." [*Id*. at 11.] Westlake responded on or around September 13, 2017 with additional documentation related to the characterization and disposal of waste from the projects. [*Id*.] Regarding this documentation, PolyOne alleges the following:

> [T]he documentation provided by Westlake was disorganized and incomplete. In addition, the laboratory analyses provided by Westlake revealed that more than 100 roll-off boxes of soil and/or debris from the excavations were not hazardous, but were improperly disposed of as hazardous waste, thereby greatly inflating disposal costs. And most significantly, the documents confirmed that there was no environmental remediation standard or purpose associated with the excavations, and that soils were excavated only to the extent necessary to install new equipment.

[*Id*.] PolyOne alleges that on or around October 19, 2017, Westlake sent another letter to PolyOne withdrawing $33,303.80 in costs submitted for the South Cracking project but demanding payment of the remaining $5,715,636.45 of Westlake's claims for the excavation and disposal costs from the South Cracking, E&E Maintenance Shop, and Hypo Tower projects. [*Id*. at 12.]

### G. Procedural Posture

On or around September 19, 2017, Westlake filed a Cross-Notice of Arbitration before the JAMS arbitration panel "requesting an award requiring PolyOne to reimburse Westlake for

100% of the claimed $5,715,636.45 in South Cracking, E&E Maintenance Shop, and Hypo Tower excavation and disposal costs," and "for 100% of the waste characterization costs incurred at the #3 Fuel Oil Tank and the E&E Maintenance Shop and 100% of the well abandonment costs at South Cracking." [*Id.*] On October 6, 2017, PolyOne filed a Complaint in this Court against Westlake. [R.1.] On October 20, 2017, Westlake filed a Motion to Dismiss. [R. 10.] On October 23, 2017, PolyOne filed a Motion to Strike Westlake's Motion to Dismiss and Request to Remove Incorrectly Filed Documents. [R. 20.] In its Motion to Strike, PolyOne requested the Court to remove Westlake's memorandum in support of its Motion to Dismiss and Exhibit 10 attached thereto, as well as strike Westlake's Motion to Dismiss. [*See* R. 20-1.] Specifically, PolyOne argued that Westlake violated the 2007 Agreement by publicly filing a confidential arbitration award, Order #20. [R. 20-1 at 2.] On October 31, 2017, PolyOne filed an Amended Complaint. [R. 23.] Thereafter, Westlake filed a new Motion to Dismiss. [R. 25.] ]. Once again, Order #20 was attached as an exhibit. [R. 25-13.] On November 24, 2017, PolyOne filed an Objection to Westlake's Motion to Dismiss, regarding the admissibility of Order #20. [R. 35.]

## DISCUSSION

The Court will address Westlake's Motion to Dismiss, [R. 25], and PolyOne's Objection to Westlake's Motion to Dismiss, [R. 35], in turn.

### A.  Motion to Dismiss

Westlake files its Motion to Dismiss pursuant to Rule 12(b)(1) and the Federal Arbitration Act, ("FAA"). [R. 25]. In essence, Westlake asks the Court to "order [the] dispute to arbitration." [R. 25-1 at 20 (Westlake Motion to Dismiss Memo.).] Thus, the Court will analyze

Westlake's motion as it would a Motion to Compel Arbitration under the Federal Arbitration Act.[2]

### 1. The Federal Arbitration Act

Congress enacted the United States Arbitration Act of 1925, more commonly referred to as the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, in response to the common law's hostility toward arbitration and the refusal of many courts to enforce arbitration agreements. The United States Supreme Court has since interpreted the FAA as codifying "a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). The Supreme Court has further stated that the FAA's underlying purpose is to put arbitration agreements "upon the same footing as other contracts." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). The FAA establishes a procedural framework applicable in both federal and state courts and also mandates that substantive federal arbitration law be applied in both. *See Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 272-73 (1995); *Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984).

The FAA applies to any "contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction." 9 U.S.C. § 2. "The Supreme Court has interpreted the language 'involving commerce' in the FAA as signaling the broadest permissible exercise of Congress' Commerce Clause power." *Sun Healthcare Grp., Inc. v. Dowdy*, No. 5:13–CV–00169–TBR, 2014 WL 790916, at *11 (W.D. Ky. Feb. 26, 2014) (citing *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003)).[3]

---

[2] PolyOne acknowledges this same point in its Response. [R. 27 at 11 (PolyOne Response).] Both parties analyze the matter under the same elements pursuant to the FAA, i.e., whether agreement to arbitrate between the parties was valid and whether the dispute falls within the scope of the arbitration agreement. [*See* R. 25-1 at 20; R. 27 at 11.]
[3] Neither party disputes that the FAA governs the arbitration agreement at issue.

Section 2 of the FAA, which governs the enforceability of arbitration agreements, provides that a written agreement to arbitrate disputes arising out of a contract involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Whereas § 2 of the FAA mandates enforcement, § 3 permits a party seeking to enforce an arbitration agreement to request that litigation be stayed until the terms of the arbitration agreement have been fulfilled. 9 U.S.C. §§ 2-3. Section 4 goes on to provide the mechanism by which a party may petition a court to compel arbitration:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

*Id.* § 4. Thus, before compelling arbitration, the Court "must engage in a limited review to determine whether the dispute is arbitrable." *Masco Corp. v. Zurich American Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004) (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)). Such review, the Sixth Circuit advises, requires the Court to determine first whether "a valid agreement to arbitrate exists between the parties," and second whether "the specific dispute falls within the substantive scope of the agreement." *Id.* (quoting *Javitch*, 315 F.3d at 624). Arbitration agreements are fundamentally contracts and, as such, courts "review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943–44 (1995)). As arbitration

agreements are a "matter of contract[,] . . . a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* (quoting *AT & T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). However, the Sixth Circuit has recognized that "in applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement . . . due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Bratt Enterprises, Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 613 (6th Cir. 2003) (quoting *Volt Info. Scis., Inc.*, 489 U.S. 468, 475–76 (1989)).

As neither party disputes that the 2007 Agreement containing the arbitration clause was valid, the Court is left to decide whether "the specific dispute falls within the substantive scope of the agreement." *Masco Corp.*, 382 F.3d at 627. Here, the specific dispute is over whether the Arbitration Panel or this Court should decide what constitutes an Allocable Cost pursuant to the 2007 Agreement. If the Court finds that arbitration is required, the Court must stay all further proceedings until arbitration concludes, 9 U.S.C. § 3, or, if all of PolyOne's claims are subject to arbitration, dismissal is the proper remedy. *Braxton v. O'Charley's Restaurant Properties, LLC*, 1 F. Supp. 3d 722, 728–29 (W.D. Ky. 2014) (detailing circuit split and listing cases); *see Ozormoor v. T–Mobile USA, Inc.*, 354 F. App'x 972, 975 (6th Cir. 2009) ("[Plaintiff] challenges the dismissal of his suit, asserting that 9 U.S.C. § 3 requires district courts to stay suits pending arbitration rather than dismiss them. We have already rejected that argument."); *Hensel v. Cargill, Inc.*, 198 F.3d 245, 1999 WL 993775, at *4 (6th Cir. 1999) (unpublished table decision) ("Under § 3 of the FAA, if any separate claim is referable to arbitration, then a stay of proceedings on the remaining claims is mandatory. However, litigation in which all claims are referred to arbitration may be dismissed.").

## 2. Analysis

The first paragraph of Exhibit C to the 2007 Agreement states:

> The provisions set forth in this Exhibit C shall govern any arbitration conducted pursuant to Section 4 of the Settlement and Release Agreement (the "Agreement"). Unless otherwise defined in this Exhibit C, any capitalized term used herein shall have the meaning set forth in the Agreement. Arbitrations conducted under Section 4 of the Agreement ("Arbitration" or "Arbitrations") shall be administered by JAMS under its Comprehensive Arbitration Rules and Procedures ("Rules"). All provisions of the Rules shall apply unless the provisions are inconsistent with this Exhibit C or the Agreement. In addition, the Parties may agree in writing not to apply particular provisions. The Arbitration shall be conducted by three arbitrators and unless otherwise agreed to by the Parties, any hearing shall be conducted in Louisville, Kentucky.

[R. 29 at 19 (2007 Agreement).] Section 4.5 of the 2007 Agreement states: "The arbitrators shall determine the amount of Allocable Costs (if disputed by the Parties) and shall determine the dollar amounts of the Allocable Costs, if any, to be paid by both Parties." [R. 29 at 6.]

In its Motion to Dismiss, Westlake asserts that the Court should enforce the arbitration clause of the 2007 Agreement and dismiss PolyOne's First Amended Complaint for lack of subject matter jurisdiction. [R. 25-1 at 19.] Specifically, Westlake argues that the plain language of Section 4.5 of the 2007 Agreement means "disputes over Allocable Costs are to be decided by an arbitration panel and not by a court." [R. 36 at 5 (Westlake Reply).] Furthermore, Westlake contends that by incorporating the JAMS Comprehensive Arbitration Rules and Procedures in Exhibit C of the 2007 Agreement the parties have "clearly and unmistakenly agreed that the arbitration panel, and not a court, decides arbitrability, and this agreement is enforceable." [R. 25-1 at 22.] In response, PolyOne interprets the 2007 Agreement as stating that any dispute "not related to determining the amount or allocation of Allocable Costs" should be designated to the Court. [R. 27 at 12.] Specifically, PolyOne argues that the narrow arbitration clause at issue only

authorizes the arbitrators to perform an "accounting analysis" of the amount of Allocable Costs, not a "definitional analysis" in deciding whether a cost is an Allocable Cost. [R. 27 at 13.]

In interpreting the 2007 Agreement, the Court recognizes that there is a presumption of arbitrability when interpreting an arbitration clause "in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *AT & T Techs., Inc.*, 475 U.S. at 650. Furthermore, the Sixth Circuit has stated that "[a]rbitrators may determine the arbitrability of claims so long as they are '*arguably* covered by the agreement.'" *Willacy v. Marotta*, 683 F. App'x 468, 471 (6th Cir. 2017) (citing *Turi v. Main Street Adoption Servs., LLP*, 633 F.3d 496, 511 (6th Cir. 2011)).

Here, the question of who will decide the dispute over whether "construction costs" qualify as Allocable Costs is at least "arguably covered by the agreement." *Willacy*, 683 F. App'x at 471 (citing *Turi*, 633 F.3d at 511). Upon examining the phrase "[t]he arbitrators shall determine the amount of Allocable Costs (if disputed by the Parties)," the Court finds that "the plain language of the instrument" could be interpreted to mean that the arbitrators have to first determine whether the costs are Allocable Costs in order to calculate the amount of Allocable Costs owed. *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016) ("Our review must begin with an examination of the plain language of the instrument."). Furthermore, the fact that PolyOne previously subscribed to Westlake's interpretation of this clause lends further credit to its possible validity. [R. 25-29 at 2-3 (PolyOne Response to Demand) ("If Westlake wishes to seek reimbursement of these costs in this arbitration, Section 4.1 of the Settlement Agreement provides that Westlake may file a cross-notice of arbitration and claim those costs as Allocable Costs in this arbitration period"); R. 25-21 (PolyOne South

Cracking Notice) ("PolyOne also reserves the right to challenge Westlake's characterization of any such costs as Allocable Costs in future arbitration proceedings undertaken pursuant to the Settlement Agreement."; R. 25-24 (PolyOne Indemnity Letter) (same); R. 25-27 at 4 (PolyOne Invoice Letter) (same).] Therefore, the Court finds that the Arbitration Panel should decide the dispute over whether "construction costs" qualify as Allocable Costs.

### 3. PolyOne's Arguments

PolyOne provides four different counterarguments to retort this interpretation of the 2007 Agreement. First, PolyOne argues that, unlike the "broad arbitration clauses" cited by Westlake, this provision is a "textbook example of a 'narrow' arbitration clause," and the presumption in favor of arbitrability should not apply to a "narrow arbitration clause." [R. 27 at 14.] The Sixth Circuit does not agree: "That '[s]uch a presumption is particularly applicable where the clause is a[ ] broad' one, does not mean that the presumption does not apply to a run-of-the-mill or a narrow arbitration clause." *Willacy*, 683 F. App'x at 472 (citation omitted). Thus, the Court finds that even if this clause were considered "narrow," it does not necessarily follow that the presumption in favor of arbitration does not apply.

Second, PolyOne argues that execution of the "Initial Responsibility" provision of the 2007 Agreement, § 3.1, would lead to absurd results under Westlake's interpretation of the arbitration provision. [R. 27 at 13.] Section 3.1 provides that "PolyOne will pay 100% of the Allocable Costs . . . unless and until that percentage is modified" in arbitration. [R. 29 at 3.] PolyOne contends that "[i]t makes no sense to force PolyOne to submit claims to the arbitrators, ask the arbitrators to determine that the claims are not claims for Allocable Costs, and then go to court to seek relief from Westlake's unjustified demand to be indemnified for its capital expenditures." [R. 27 at 13.] The Court is not clear as to why PolyOne would have to go to court

to seek relief from Westlake when the Arbitration Panel decides "the dollar amounts of the Allocable Costs, if any, to be paid by both Parties." [R. 29 at 6, § 4.5.] In fact, according to § 6.2 of the 2007 Agreement, within fifteen days of the issuance of the arbitrators' award, "PolyOne shall deliver a written notice to Westlake demanding payment of the amounts, if any, that PolyOne asserts Westlake should pay of the Allocable Costs. Such a demand shall be consistent with and for the amount of the arbitrators' award and shall be issued in the name of and on behalf of Goodrich." [R. 29 at 7.] Under the 2007 Agreement, PolyOne would only have to go to court if it disagrees with the arbitrators' award and decides to file a complaint for judicial determination pursuant to § 6.3.

Third, PolyOne claims that it was the "clear intent" of the parties to settle disputes over the characterization of costs in court, not arbitration. [R. 27 at 14.] PolyOne states that its previous reservations of the right to challenge Westlake's characterization of its construction and demolition costs as Allocable Costs, as cited in Westlake's Motion to Dismiss, are consistent with this intent. [R. 27 at 14.] However, these reservations PolyOne speaks of actually reveal the opposite intent. Specifically, PolyOne stated: "PolyOne also reserves the right to challenge Westlake's characterization of any such costs as Allocable Costs *in future arbitration proceedings* undertaken pursuant to the Settlement Agreement." [R. 25-21 (emphasis added).] PolyOne specifically reserved the right to challenge the characterization of costs in arbitration, not in this Court.

Finally, PolyOne argues that Westlake incorrectly asserts that JAMS Rule 11 grants the arbitrators jurisdiction over this matter. [R. 27 at 15.] As cited by both parties,[4] JAMS Rule 11(b) states:

---

[4] Although both parties cite the same rule, in the 2014 edition, cited by Westlake, it is labeled as 11(b), while in the 2007 version, cited by PolyOne, the rule is labeled as 11(c).

18

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

[R. 25-8 at 2; R. 27-16 at 6-7.] Specifically, PolyOne contends that the arbitration provision at hand is a "customized, extensively negotiated, and expressly limited jurisdictional provision" which limits the arbitrators' jurisdiction to only determining the amount and allocation of Allocable Costs and gives "exclusive jurisdiction" over other matters to the Court. [R. 27 at 15-16.] Thus, PolyOne reasons that JAMS Rule 11 is inconsistent with the terms of the 2007 Agreement and does not apply. [*Id*. at 16.] However, the Court has found that the dispute over who will decide whether "construction costs" qualify as Allocable Costs is at least "arguably covered by the agreement." Therefore, the Court does not agree with PolyOne that JAMS Rule 11 is inconsistent with the 2007 Agreement and should not apply to the arbitration provision at issue.

In summary, the Court finds that the question of who will decide the dispute over whether "construction costs" qualify as Allocable Costs is at least "arguably covered by the agreement," and, therefore, it falls under the jurisdiction of the Arbitration Panel.[5] Westlake's Motion to Dismiss as it pertains to Count One of PolyOne's Amended Complaint is GRANTED.

### C. PolyOne's Remaining Claims

In the second and third counts of its Amended Complaint, PolyOne disputes the costs incurred by Westlake at South Cracking, the E&E Maintenance Shop, and the Hypo Tower and submitted for indemnification under the 1990 Master Conveyance Agreement, as well as the costs incurred by Westlake at the Soda Ash Reactor, the Mercury Cell Building, South Cracking,

---

[5] The Court finds it unnecessary to address the parties' arguments regarding whether "construction costs" qualify as Allocable Costs under the 2007 Agreement upon holding that the Arbitration Panel should decide this dispute.

the E&E Maintenance Shop, and the Hypo Tower and submitted for indemnification under the 1997 Purchase and Sale Agreement. [R. 23 at 16-17.] PolyOne claims that these claims for declaratory relief are ripe for adjudication and that the Court currently has authority to grant relief for both counts. [R. 27 at 28.] In effect, PolyOne asks the Court to decide the same question, i.e. whether "construction costs" are Allocable Costs, under the 1990 and 1997 agreements that the Court has found should be decided by the Arbitration Panel under the 2007 Agreement. It would be illogical and against the interest of judicial economy for the Court to send this issue to the Arbitration Panel and then simultaneously announce its own decision on the matter. If PolyOne disagrees with the decision of the Arbitration Panel, it may seek a de novo judicial determination of "(1) the amount of the Allocable Costs, and/or (2) the appropriate dollar division of the Allocable Costs between the Parties" within ninety days of the issuance of the arbitrators' award, pursuant to § 6.3 of the 2007 Agreement. [R. 29 at 7.] Thus, Westlake's Motion to Dismiss as it pertains to Count Two and Three of PolyOne's Amended Complaint, regarding whether "construction costs" are Allocable Costs, is GRANTED.

In Count Four, PolyOne pleads a claim of Restitution/Unjust Enrichment. [R. 23 at 17-18.] Specifically, PolyOne claims that it paid Westlake $839,058.73 for costs it incurred during the Soda Ash Reactor construction and Mercury Cell Building demolition projects. [*Id*. at 18.] PolyOne states that it paid these costs "based on a good faith but mistaken belief that the costs were covered under the 2007 Settlement Agreement." [*Id*.] Now, PolyOne argues that it is entitled to the return of these payments as restitution. [*Id*.] Once again, PolyOne asks the Court to decide the same dispute the Court has already decided belongs to the Arbitration Panel: whether "construction costs" qualify as Allocable Costs. As the Arbitration Panel will be making this decision, the Court will not rule on this issue. Westlake's Motion to Dismiss as it pertains to

Count Four of PolyOne's Amended Complaint, regarding whether "construction costs" are Allocable Costs, is GRANTED.

As all of PolyOne's claims are subject to arbitration, dismissal is the proper remedy. *Braxton*, 1 F. Supp. 3d at 728–29 (W.D. Ky. 2014) (detailing circuit split and listing cases); *see Ozormoor*, 354 F. App'x at 975 ("[Plaintiff] challenges the dismissal of his suit, asserting that 9 U.S.C. § 3 requires district courts to stay suits pending arbitration rather than dismiss them. We have already rejected that argument."); *Hensel v. Cargill, Inc.*, 198 F.3d 245, 1999 WL 993775, at *4 ("Under § 3 of the FAA, if any separate claim is *594 referable to arbitration, then a stay of proceedings on the remaining claims is mandatory. However, litigation in which all claims are referred to arbitration may be dismissed."). Thus, Westlake's Motion to Dismiss is GRANTED. However, as PolyOne may choose to seek a "de novo judicial determination of (1) the amount of the Allocable Costs, and/or (2) the appropriate dollar division of the Allocable Costs between the Parties," Count Two, Count Three, and Count Four are DISMISSED WITHOUT PREJUDICE. Count One is DISMISSED WITH PREJUDICE.

### D. PolyOne's Objection

PolyOne asserts in its Objection that the Court should "disregard the exhibit [containing Order #20] and any related arguments in ruling on Westlake's motion." [R. 35 at 1 (Objection).] Specifically, PolyOne argues that the plain meaning of Section 10.3 of the 2007 Settlement Agreement between PolyOne, Westlake, and Goodrich Corporation is that "any arbitration award may not be admitted in any judicial proceeding." [Id. at 3.] Westlake disagrees. It argues that PolyOne's Objection "is an attempt to withhold relevant evidence from this Court demonstrating that PolyOne's claims in this action are subject to mandatory arbitration." [R. 38 at 1 (Response to Objection).] As the Court is able to rule on Westlake's Motion to Dismiss without considering

Order #20 or any related arguments, PolyOne's Objection, [R.35], is DENIED AS MOOT. PolyOne's previous Motion to Strike Westlake's original Motion to Dismiss and Request to Remove Incorrectly Filed Documents, [R. 20], is also DENIED AS MOOT.

## CONCLUSION

For the foregoing reasons, Westlake's Motion to Dismiss, [R. 25], is **GRANTED**. Westlake's previous Motion to Dismiss, [R. 10], is **DENIED AS MOOT**. PolyOne's Objection, [R. 35], is **DENIED AS MOOT**. PolyOne's Motion to Strike Westlake's Motion to Dismiss and Request to Remove Incorrectly Filed Documents, [R. 20], is **DENIED AS MOOT**. The Court will enter a separate Order and Judgment consistent with this Memorandum Opinion.

cc: Counsel of Record